***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. Upon *Page 2 
reconsideration, the Full Commission affirms in part, reverses in part, and modifies in part the Opinion and Award of Deputy Commissioner Hall.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. An employee-employer relationship existed at all times relevant to this proceeding.
2. Plaintiff was born on October 21, 1982 and was 26 years old at the time of the hearing before the Deputy Commissioner.
3. Zurich American Insurance Company (Zurich) was the carrier/administrator on the risk at all times relevant to this proceeding.
4. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant to this proceeding, the defendant-employer employing the requisite number of employees to be bound under the provisions of said Act.
5. Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer on August 11, 2008.
6. The parties stipulated that, no less than 10 days prior to the scheduled deposition of any witness they proposed to offer as an expert, any report, records, written opinions, or other documentary information generated by such witness shall be made available to the opposing party. This requirement does not apply to plaintiff's prior treating physicians whose records are already in the possession of the parties.
7. Plaintiff's issues for determination by the Deputy Commissioner were: *Page 3 
 (a) Whether defendants must provide plaintiff with adaptive housing outside of an institutional facility such as a nursing home;
 (b) Whether defendants must provide plaintiff with adaptive housing in a populated area with access to transportation to medical facilities and within ambulance routes;
 (c) How many hours a day and how many days a week are defendants obligated to provide attendant care;
 (d) What is the level of skill that attendant care takers to be provided must have;
 (e) Whether defendants must provide a separate area for the attendant care staff away from plaintiff for privacy issues;
 (f) What adaptive transportation vehicle is plaintiff entitled to be provided by defendants;
 (g) What accessible parking for plaintiff and attendant care staff is plaintiff entitled to be provided by defendants;
 (h) What television and other entertainment is plaintiff to be provided by defendants;
 (i) What intercom or specialized communication system is plaintiff entitled to be provided by defendants;
 (j) What medical and other benefits is plaintiff entitled to receive at defendants' expense such as disposables and durable equipment;
 (k) What is the appropriate size and design of adaptive dwelling that the defendants shall provide at their expense; *Page 4 
 (l) What sanctions in the form of attorneys' fees and penalties should be assessed against defendants;
 (m) What is the applicable average weekly wage;
 (n) What is the extent of indemnity benefits plaintiff is entitled to receive;
 (o) Whether defendants should be taxed with the cost of preparation of the life care plan for plaintiff;
 (p) Whether plaintiff is entitled to an IME at defendants' expense to determine the most suitable housing for him;
 (q) What amount for maintenance of and utilities for adaptive housing should defendants bear;
 (r) What amount for maintenance of an adaptive vehicle should defendants bear;
 (s) Whether plaintiff is entitled to an IME, at defendants' expense, specifically in response to Dr. Bilsky's opinion regarding his current housing;
 (t) Whether plaintiff is entitled to an evaluation by a licensed psychiatrist regarding his present mental condition.
8. Defendants' issues for determination before the Deputy Commissioner were:
 (a) What, if any, treatment, attendant care services, adaptive or assistive equipment and housing, disposable and durable equipment, or other services and goods, however defined, requested by plaintiff constitute "medical compensation" as defined by N.C. Gen. Stat. § 97-2(19) reasonably required to effect a cure, give relief, for which defendants are responsible under the Workers' Compensation Act;
 (b) What, if any, treatment, attendant care services, adaptive or assistive equipment and housing, disposable and durable equipment, or other services and goods, however defined, requested by plaintiff constitute ordinary necessities of life which are usually purchased from wages, or are typically payable from income, and would not be compensable under the Workers' Compensation Act as medical or related compensation; *Page 5 
 (c) Whether defendants have provided satisfactory living quarters and assistive care for plaintiff as required by the Workers' Compensation Act;
 (d) Whether defendants are entitled to direct plaintiff's medical treatment, including providing such treatment, attendant care services, adaptive or assistive equipment and housing, disposable and durable equipment, or other services and goods, however defined, as may be recommended by plaintiff's authorized treating physicians and as may be required by the Workers' Compensation Act, through vendors and providers selected by defendants, which meet plaintiff's required level of care in an economically prudent manner;
 (e) Whether defendants are entitled to direct plaintiff's medical treatment, including providing such treatment, attendant care services, adaptive or assistive equipment and housing, disposable and durable equipment, or other goods and services, however defined, as may be recommended by plaintiff's authorized treating physicians and as may be required by the Workers' Compensation Act through vendors and providers who are subject to or agree to be bound by the North Carolina Industrial *Page 6 
Commission's fee schedule;
 (f) Whether defendants are obligated to pay for a life care plan where plaintiff has not and will not reach maximum medical improvement and his ongoing medical, surgical, hospital, nursing and rehabilitative needs will be defined and prescribed on a continuing basis by his authorized treating physicians;
 (g) If the Industrial Commission determines that a life care plan is indicated in this case, whether defendants, who are paying disability compensation and have the right to direct plaintiff's medical compensation, subject to approval of the Industrial Commission, have the right to select a qualified life care planner with an established medical background to prepare such a plan after consulting with plaintiff's treating physicians regarding his needs;
 (h) If the Industrial Commission determines that a life care plan is indicated in this case, whether, in the interest of fairness to all parties, the Industrial Commission should designate a qualified individual with an established medical background to prepare such a plan after consulting with plaintiff's treating physicians;
 (i) Whether plaintiff must cooperate with all medical, nursing, attendant care, and rehabilitative providers selected by defendants;
 (j) Whether defendants are obligated to provide an independent medical examination for plaintiff for any reason outside that permitted by N.C. Gen. Stat. § 97-27(b).
9. Plaintiff made a motion to the Full Commission to reopen the record for the consideration of additional evidence and updating the record. Defendants did not object to the *Page 7 
admission of the additional evidence, and therefore the additional evidence, consisting of a progress report dated May 27, 2010, by nurse case manager Jan Berry, is made a part of the evidence of record.
10. As revealed in the progress report from Ms. Berry, after entry of the Deputy Commissioner's Opinion and Award, plaintiff relocated to his own apartment and defendants are providing 24-hour attendant care. Therefore, many of the issues identified by the parties at the hearing before the Deputy Commissioner are rendered moot. The primary issues currently pending before the Full Commission concern the provision of handicapped accessible housing and transportation for plaintiff and whether plaintiff should be awarded attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
The following were marked and received into evidence as:
 EXHIBITS *Page 8 
1. Stipulated Exhibit 1 — Includes various medical records, reports, and emails submitted by plaintiff totaling 1,865 pages with the exception of the following pages that were not stipulated to by defendants: Alexandra Phipps Questionnaire pp. 1425-26, Dr. Frinks' affidavit pp. 1577-78, Life Care Plan and supplements pp. 1652-1738, and fax cover sheets pp. 1801-02.
2. Defendants' Exhibit 1 — Paradigm outcome plan contract.
3. Defendants' Exhibit 2 — Email from Anna Gibson dated 12-1-08.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the initial hearing on his claim before the Deputy Commissioner, plaintiff was 26 years old and living in the Briarcliff Haven Healthcare Rehabilitation Center (Briarcliff Haven) in Atlanta, Georgia.
2. On August 11, 2008, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer when he was working on a barge near New Bern, North Carolina and a crane cable broke, knocking him into the water.
3. Plaintiff was taken to Pitt County Memorial Hospital, where he came under the care of Dr. Michael Sharts, a neurosurgeon, who diagnosed a C4-5 fracture dislocation. On the evening of August 11, 2008, Dr. Sharts performed a C4-5 discectomy and fusion, and a posterior C2-7 laminectomy and instrumented fusion. Dr. Sharts saw plaintiff in the hospital for three brief bedside examinations following surgery. On August 15, 2008, plaintiff was transferred to Shepherd Center in Atlanta, Georgia, for continued treatment and rehabilitation.
4. Plaintiff was admitted to Shepherd Center on August 15, 2008 under the care of Dr. Gerald Bilsky, who coordinated plaintiff's care with other specialists during his hospitalization and continues to be plaintiff's primary treating physician. Shepherd Center provides rehabilitative services for patients with significant neurologic injuries and illnesses, predominantly spinal cord and brain injuries and is one of the leading spinal cord rehabilitation facilities in the southeast.
5. Shepherd Center provides a continuum of care for its patients that ranges from acute inpatient treatment to an outpatient day program where patients further their rehabilitation. Plaintiff was admitted to acute inpatient treatment initially, which was essentially a continuation of his critical care that began at Pitt County Memorial Hospital. Plaintiff remained in the inpatient program until October 24, 2008, when he was discharged to the day program. *Page 9 
6. Patients participating in the day program are permitted to live in apartments owned by Shepherd Center. These apartments are not intended to be permanent residences and are only available to patients while they are completing the day program. Upon completion of the day program, patients are discharged back into the community into a variety of settings. While participating in the day program, plaintiff lived in an apartment owned by Shepherd Center. He was provided 24-hour attendant care during this time through Accord Services, an independent agency. Plaintiff remained in the day program until he was discharged on December 5, 2008.
7. As a result of his injury by accident on August 11, 2008, plaintiff is an ASIA A-B quadriplegic. Plaintiff requires attendant care 24-hours per day, seven days per week, for his bladder and bowel programs and for assistance with activities of daily living. Plaintiff is originally from Mexico and is an undocumented worker.
8. Almost immediately following plaintiff's injury, defendant-carrier assigned his case to Paradigm, a California business that provides case management services to workers' compensation insurance carriers for catastrophic claims. When plaintiff was transferred to Shepherd Center, Paradigm assigned Anna Gibson as plaintiff's nurse case manager. Ms. Gibson is a registered nurse with experience managing catastrophic claims. In addition to providing case management services for plaintiff, Ms. Gibson collected information for Paradigm to be used in preparing an Outcome Plan Contract for plaintiff. An Outcome Plan Contract is a proposal whereby for a flat dollar amount, Paradigm will cover all medical expenses of a patient for a period of time or until an agreed outcome has been reached. In its contracts, Paradigm includes certain items, such as medical treatment, physician fees, medications, durable goods, and nursing charges. Paradigm excludes other items such as non-medical transportation and housing. *Page 10 
9. After plaintiff moved to the day program at Shepherd Center on October 24, 2008, and with the understanding that he would eventually be discharged, the adjuster handling plaintiff's claim for defendants, Sheila Faeth, instructed Ms. Gibson to explore housing options for plaintiff. Ms. Gibson advised Ms. Faeth that due to certain laws in Georgia concerning illegal immigrants, many landlords refused to lease apartments unless a person could prove he was legally in the United States. Ms. Gibson had conducted an extensive housing search in another case one year earlier and could only find one apartment that would take an undocumented person. She contacted that apartment complex in October 2008 and was told that verification of legal status was required to rent an apartment. Ms. Gibson identified one company that had several apartments leased that they would sublease to an undocumented person. This company was Accord Services and the rent was $3,000.00 per month for a two-bedroom apartment. Accord had a one apartment available November 1, 2008. Ms. Gibson never looked at the Accord apartment to determine whether the apartment could accommodate plaintiff's disability. However, it did not have an accessible bathroom, i.e., a roll-in shower, which plaintiff required. There was another apartment near Shepherd Center for $1,200.00 per month, but the tenant had to be lawfully in the country.
10. In her report to Ms. Faeth dated October 27, 2008, Ms. Gibson stated that "I do not recommend a nursing home as he will be in a setting that will not optimize his overall learning and implementation of rehab treatment to maximize his long term independence. . . . Nursing homes have sicker patients which can expose him to infections. The setting in a nursing home more closely resembles a hospital settling which reinforces a `sick' mentality and leads to depression based on my experience." *Page 11 
11. Ms. Gibson explored placement for plaintiff in an assisted living facility. She advised Ms. Faeth on October 27, 2008 that she had contacted multiple independent living facilities and that many facilities had a minimum age of 55 or above and required the person to be ambulatory. Ms. Gibson identified one facility that would accept plaintiff. This facility had a one bedroom unit available, but plaintiff would have to use the roll-in shower in the fitness room to bathe. The facility required a $1,000.00 non-refundable application fee and a monthly rent of $3,660.00. No one at Shepherd Center ever expressed an opinion to Ms. Gibson that plaintiff should be placed in any particular setting when he left that facility. Ms. Gibson denied that Ms. Faeth ever expressed a concern to her about cost as a factor in identifying housing for plaintiff.
12. After the contract between defendant-carrier and Paradigm was rejected, Ms. Gibson notified Ms. Faeth on December 1, 2008 that she would be "off" plaintiff's case as of "today." Ms. Gibson was removed from plaintiff's case by Paradigm because of a non-compete clause she had with the company that prohibited her from continuing to provide nurse case management services on cases where an Outcome Plan Contract was not accepted. The greater weight of the evidence does not show that defendant-carrier, and in particular Ms. Faeth, discharged Ms. Gibson from plaintiff's case because of any recommendations Ms. Gibson made regarding plaintiff's care or placement.
13. Upon receiving notice that Ms. Gibson's involvement in plaintiff's case was ending on December 1, 2008, Ms. Faeth reassigned plaintiff's case to Jan Berry, a catastrophic nurse case manager with defendant-carrier. At the time the transfer was made, Ms. Gibson had not located suitable housing for plaintiff, who was scheduled for discharge from Shepherd Center on December 5, 2008. Ms. Berry had a very limited period of time to locate housing for plaintiff, so she contacted Briarcliff, a facility where she previously had a patient. Ms. Berry felt Briarcliff *Page 12 
Haven was a satisfactory place for plaintiff's medical and safety concerns to be met. After personally visiting the facility, Ms. Berry arranged for plaintiff to be placed in the sub acute rehabilitation unit at Briarcliff Haven where he had access to occupational therapy, physical therapy, speech therapy, and related services. Plaintiff chose to remain in Atlanta, although he had no family or friends in the city. Plaintiff was relocated to Briarcliff Haven on December 5, 2008 and remained there until spring 2010 when he moved into an apartment.
14. Plaintiff voiced a number of complaints about residing at Briarcliff Haven and he offered the opinions of several witnesses to support moving him to an accessible apartment based on those complaints. Plaintiff's complaints about Briarcliff Haven included the presence of mostly elderly residents with few residents his age, excessive noise, and offensive smell. He complained that the food was bad and that his mother had to bring him food. He also expressed concerns about developing infections and, in particular, dysreflexia, due to the nursing staff not timely performing his intermittent catheterizations.
15. Ms. Berry received at least two emails from Accord supervisors addressing care issues and concerns from Accord nursing staff providing care to plaintiff. The dates of the emails range from December 15, 2008 to September 17, 2009. The emails express the same concerns plaintiff voiced and span over a 10 month period. The complaint on both occasions was that plaintiff's intermittent catheterizations were not being performed timely. Ms. Berry addressed the problem with staff members at Briarcliff Haven. In response to this situation, additional Accord nursing staff were brought in to assist plaintiff while he was in Briarcliff Haven, because Ms. Berry was unable to obtain adequate assurances that this problem would not persist. At the time of her deposition, Ms. Berry was informed by plaintiff and the Accord nurses that his catheterizations were then being performed properly and timely. *Page 13 
16. Plaintiff was placed by defendants in the subacute rehabilitation unit at Briarcliff Haven where he had his own private room equipped with a television and handicapped accessible bathroom. Ms. Berry acknowledged this type of unit is not intended to be a permanent placement, but instead is a temporary placement. Plaintiff remained in this unit for approximately one and one-half years. Defendants indicated plaintiff was placed at Briarcliff Haven as a necessity to have him quickly placed when his stay at Shepherd Center ended on December 5, 2008. As of the close of evidence in this case, defendants had not presented any evidence of a plan for plaintiff's living arrangements upon leaving the subacute unit. Plaintiff clearly expressed interest in becoming more independent and a desire to live on his own. Placing plaintiff in a position to maximize his independence is a repeated goal expressed throughout the medical evidence of this record.
17. The Full Commission finds that plaintiff's complaints of noise, food quality, smell and neighboring patients ages are subjective and not proof of inadequate care. However, the greater weight of the evidence does support plaintiff's concerns about infections, due to inadequate medical care, including medical orders not being followed regarding the timeliness of intermittent catheterizations. Briarcliff Haven staff could not assure plaintiff his intermittent catheterizations would be performed as ordered and this issue recurred over a 10 month period. Plaintiff's concerns about infections were substantiated by Accord staff through emails and based on Accord having to provide supplemental medical services to plaintiff during his stay at Briarcliff Haven.
18. Plaintiff testified that during his stay at Briarcliff Haven, he had multiple bladder infections and had experienced dysreflexia multiple times. He attributed these problems to a failure by Briarcliff Haven staff to provide his necessary intermittent catheterizations. Plaintiff had *Page 14 
to be taken to Emory University Hospital on March 21, 2009, May 22, 2009, and June 30, 2009. He also went to Piedmont Hospital on May 22, 2009. Although the medical records do not show that plaintiff was ever diagnosed with autonomic dysreflexia, the increased threat of illness due to staff improperly following medical orders is sufficient to substantiate plaintiff's concerns. On four occasions, it was noted plaintiff was either diaphoretic or went to Emory Hospital. Following removal of plaintiff's suprapubic catheter, Accord assumed responsibility for plaintiff's intermittent catheterization program 50% of the time. The additional supplemental care provided by Accord was due to Briarcliff Haven's inability to assure they could properly follow plaintiff's medical orders and timely perform his intermittment catheterizations.
19. Dr. Bilsky, plaintiff's authorized treating physician, has followed plaintiff since August 15, 2008. He has been board certified in physical medicine and rehabilitation since 1990 and has worked at Shepherd Center 12 years, where he currently serves as the associate medical director of the brain injury unit and medical director of outpatient services. He was tendered, without objection, as an expert in physical medicine and rehabilitation, with a concentration in spinal cord injuries. When Dr. Bilsky saw plaintiff on January 5, 2009, he approved plaintiff's use of the public transportation system. Dr. Bilsky felt plaintiff needed to live in a safe environment, which was being provided at Briarcliff Haven. Although Dr. Bilsky did not feel it was medically necessary for plaintiff to be moved from Briarcliff Haven, he did not contend it would be unsafe to place plaintiff in an apartment with 24 hour care. Dr. Bilsky also confirmed that plaintiff's current medical needs were not acute. Dr. Bilsky indicated that most patients with spinal cord injuries are discharged to private residential settings.
20. Dr. Andrew Frinks, the medical director at Briarcliff Haven, followed plaintiff regularly at Briarcliff Haven. Plaintiff's clinical examinations were consistently good, with no *Page 15 
evidence of new depressive symptoms. Dr. Frinks felt plaintiff was receiving appropriate nursing services at Briarcliff Haven and that the facility provided a safe, sanitary, and hospitable living environment for him. Dr. Frinks signed an affidavit prepared by plaintiff's attorney indicating that plaintiff should be placed outside Briarcliff Haven. Although this opinion was based solely on the fact that plaintiff would be "happier" living elsewhere, it supports plaintiff becoming as independent as possible within the community and the fact that the subacute care at Briarcliff Haven is intended to be a temporary, not permanent, living and medical care arrangement.
21. Plaintiff offered the testimony of Dr. Sharts in support of his request to leave Briarcliff Haven. Dr. Sharts performed the initial surgery after plaintiff's accident and had not seen plaintiff since August 14, 2008 at the time of his deposition on December 8, 2009. Dr. Sharts was unfamiliar with Briarcliff Haven and indicated that Dr. Bilsky was in the best position to know plaintiff's current housing and medical needs. However, it was Dr. Sharts' expert opinion that plaintiff would be much better off living independently, for multiple reasons. Dr. Sharts indicated individuals with this type of injury often live very full lives, but it may take time for them to learn to function in society. Dr. Sharts stated that being confined to a nursing home would not allow a person to live an independent full life. Dr. Sharts confirmed that independent living is preferred for plaintiff.
22. Karen Smith, R.N., director of the Nurses Section of the North Carolina Industrial Commission, had limited involvement in plaintiff's case, but reviewed the depositions of Drs. Frinks, Bilsky and Scelza and the life care plan prior to the taking of her deposition. She also had some contact with Ms. Gibson and Ms. Berry in 2008. It was Ms. Smith's expert opinion that it was in plaintiff's medical best interest to be housed in a place where his independence is optimized, which means someplace other than a skilled nursing home or long-term care facility. *Page 16 
She also opined that the care of a quadriplegic patient is not easily done by nurses in a nursing home who are not physically in the room all the time with the patient. However, Ms. Smith agreed that the opinion of plaintiff's treating physician should control in plaintiff's case.
23. The staff at Shepherd Center referred plaintiff to psychologist Dr. Alexandra Phipps who sees plaintiff every other month or more frequently as needed. Dr. Phipps diagnosed plaintiff with adjustment disorder with mixed anxiety and depressed mood, and pain disorder. Plaintiff complained to Dr. Phipps about Briarcliff Haven, telling her that the environment was depressing, the food was bad, the patients were elderly and noisy, and that there were not enough nurses and the nursing service was poor. Plaintiff reported anxiety, sleep problems, low energy, social isolation, problems with his appetite, weight loss, and feelings of hopelessness. Dr. Phipps expressed the opinion that it would be better for plaintiff to be moved to a place where he could be independent because he was frustrated being in the nursing home. She further stated that living in Briarcliff Haven was having a negative impact on plaintiff's mental health.
24. At her deposition, the initial nurse case manager assigned to plaintiff's case, Anna Gibson, stated that she was not familiar with Briarcliff Haven and had not reviewed any records for plaintiff after December 1, 2008 when Paradigm removed her from plaintiff's case. Ms. Gibson agreed that the recommendations of plaintiff's treating physician should be followed. However, it was her expert opinion as a rehabilitation nurse that the best housing environment for plaintiff would be an apartment with 24-hour caregivers. The second choice would be assisted living where plaintiff would have his own space, with assistance nearby. The third and last choice, according to Ms. Gibson, was a skilled nursing facility.
25. Plaintiff's life care planner arranged for plaintiff to see Dr. William Scelza, the director of the spinal cord injury rehabilitation program at Carolinas Rehabilitation Hospital in *Page 17 
Charlotte. Dr. Scelza has been with that facility since March 13, 2006. Dr. Scelza reviewed plaintiff's records of prior treatment, interviewed plaintiff, and performed a clinical evaluation on June 15, 2009. The purpose of Dr. Scelza's evaluation of plaintiff was to make recommendations to assist the life care planner. Dr. Scelza felt plaintiff had some component of depression. In their discussions, plaintiff indicated to Dr. Scelza that he felt he would be much better off and would function better not being in a skilled nursing facility. Dr. Scelza agreed that a young person of plaintiff's age is not ideally managed in a skilled nursing facility. In his own spinal cord injury rehabilitation program, Dr. Scelza typically has a discharge plan prepared for patients to return to their homes as frequently as possible. As to transportation provided for plaintiff, Dr. Scelza believed that transportation through a transportation service was suitable and that using public transport also was acceptable as long as it was accessible. Dr. Scelza agreed that Dr. Bilsky was in the best position to determine plaintiff's actual needs and that, to the extent his opinions conflicted with those of Dr. Bilsky, Dr. Bilsky's opinions should control.
26. Plaintiff, through counsel, retained the services of Michael Fryar to prepare a life care plan for plaintiff. Mr. Fryar had been self-employed as a vocational rehabilitation consultant and life care planner less than one year when he was retained in the present case. Mr. Fryar has a two year nursing degree, with no further medical training. He has an undergraduate degree in psychology, but has never been certified as a psychologist. He lists on his curriculum vitae a certification from an agency that no longer exists and one awarded by an agency that provides a manual from which the certifying examination is taken. Mr. Fryar received his life care planning training online from Kaplan University, which to his knowledge has no physical location. He applied online, registered online, and completed his study modules online, having never sat for a single proctored examination. *Page 18 
27. Mr. Fryar defined a life care plan as an "unbiased and objective" and "fair and balanced" assessment of a client's needs, regardless of the referral source. It is unclear from the record whether Mr. Fryar's level of experience in preparing life care plans is adequate to prepare an assessment for this catastrophic situation. In preparing his life care plan, Mr. Fryar reviewed plaintiff's medical records and excerpted comments from those records as part of his report. Rather than preparing an unpartial assessment of plaintiff's lifetime needs, Mr. Fryar appears to have started with the premise that plaintiff should be removed from Briarcliff Haven and excerpted portions of the medical records to support this premise. Mr. Fryar's assessment does not appear to have explored other housing options and does not provide explanations why alternative housing options are not viable. Mr. Fryar cites extensively to literature from the Internet and extracted portions of the medical records and his assessment contains little original work. The life care plan does not contain a comprehensive summary of Mr. Fryar's recommendations and lacks a concise conclusion that explains these recommendations.
28. The Full Commission does not find Mr. Fryar's life care plan to be unbiased, objective, and balanced. Accordingly, the Full Commission gives little weight to the testimony of Mr. Fryar and the life care plan he prepared in this case. The life care plan is not as comprehensive as it needs to be and therefore does not constitute a legitimate rehabilitative service. Plaintiff, a quadriplegic who is in his twenties, should be provided an appropriate life care plan by an impartial, well-qualified, certified life care planner with long-standing experience dealing with catastrophic life care plans. The life care plan should identify and provide for plaintiff's needs to ensure that appropriate care and treatment are provided to give relief from the symptoms associated with plaintiff's injuries and to prevent further deterioration of his condition. Plaintiff is also entitled to an evaluation of his current living situation by the life care planner. *Page 19 
29. The greater weight of the lay and medical evidence establishes that living in Briarcliff Haven was having a negative impact on plaintiff's mental health. Although Briarcliff Haven may have been a safe environment for plaintiff, the nursing staff at Briarcliff Haven was unable to provide timely, adequate medical care for plaintiff's physical needs and it was necessary for defendants to contract with outside nurses to provide necessary nursing care. Placing plaintiff in a position to maximize his independence is a repeated goal expressed throughout the medical evidence of this record. Therefore, the Full Commission finds that it was in plaintiff's medical best interest for defendants to provide housing suitable for the maximum possible level of independence, which means someplace other than a skilled nursing home or long-term care facility.
30. At the time of the injury by accident plaintiff did not own a dwelling. He shared the rental of an apartment near New Bern, North Carolina, splitting the rent three ways with two other people. Plaintiff owns no property that can be made handicapped accessible for use by him in his post-injury condition.
31. The only evidence before the Full Commission concerning plaintiff's current living arrangements is the progress report dated May 27, 2010, from nurse case manager Jan Berry. The report states in pertinent part that plaintiff is "very pleased to now have his own apartment. There are some modifications needed to the bathroom so he can shower there, small ramp into the apartment for ease of entry, changing door knobs to levers so he can open doors independently, removing carpet and installing laminate would make moving about apartment easier. I am currently obtaining estimates on the modifications from 2 contractors and may need to get a 3rd." Ms. Berry further noted that she planned to meet with the apartment manager to discuss modifications by May 28, 2010, and that once the renovations were approved, she planned to *Page 20 
coordinate the work and secure alternate housing for plaintiff during the modification work.
32. Plaintiff maintains that because he has no dwelling that can be adapted to be handicapped accessible, he is entitled to payment by defendants for the lease of a handicapped accessible apartment. Defendants respond that they provided suitable accommodations for plaintiff at Briarcliff Haven and that they are not obligated to pay for the lease of plaintiff's handicapped accessible apartment. It is noted, however, that for many years defendants have in effect paid for the entire cost of plaintiff's housing at both Shepherd Center and Briarcliff Haven.
33. The Full Commission finds that because plaintiff has no dwelling that can be renovated to provide handicapped accessible housing, defendants are responsible for providing handicapped accessible housing for plaintiff. In this case, the greater weight of the evidence shows that plaintiff should be placed in housing that will allow him to have as much independence as possible. Reasonable handicapped accessible housing for plaintiff at this time is an apartment which can accommodate the necessary 24-hour daily attendant care for plaintiff. Although defendants are obligated to pay for the lease of such apartment, the selection of an apartment must be reasonable under the circumstances. An assessment by a certified life care planner of plaintiff's current living quarters is necessary to ascertain whether the apartment is appropriate handicapped accessible housing to accommodate plaintiff's physical needs.
34. Plaintiff has never possessed a driver's license or owned a motor vehicle. Since his discharge from Shepherd Center, defendants have provided transportation for plaintiff through a private company for medical visits, therapy, and recreation at Shepherd Center, and social activities. Defendants also assisted plaintiff in obtaining his MARTA pass for the public transportation system in Atlanta. He has an electric wheelchair he uses for local trips. Dr. Bilsky and Dr. Scelza considered these reasonable transportation options for plaintiff. Defendants are *Page 21 
not obligated to purchase a vehicle for plaintiff, but would be obligated to modify any vehicle plaintiff purchases for his own transportation to make it accessible to plaintiff's needs. The Full Commission finds that the transportation services currently being provided plaintiff by defendants are reasonable.
35. Plaintiff raised an issue in the pre-trial agreement regarding average weekly wage, but failed to produce any evidence on that issue. The Full Commission takes judicial notice of a Form 63 previously filed in this matter establishing an average weekly wage of $745.12 and a compensation rate of $496.77.
36. Given the number of issues raised by plaintiff in the pre-trial agreement, the Full Commission finds that defendants were reasonable in their defense of this claim.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on August 11, 2008, arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As the result of the injury by accident, plaintiff is permanently totally disabled and is entitled to payment by defendants of permanent total disability compensation at the rate of $496.77, as well as medical treatment, for his lifetime. N.C. Gen. Stat. §§ 97-25, 97-29, 97-31(17).
3. Plaintiff is entitled to attendant care 24 hours per day, seven days per week provided by qualified nursing personnel, which he is currently receiving and which is being *Page 22 
provided by defendants. N.C. Gen. Stat. § 97-2(19). Such services are necessary to effect a cure, give relief or lessen disability from plaintiff's injury.
4. N.C. Gen. Stat. § 97-2(19) provides that in cases where the injured worker is totally and permanently disabled, the employer shall pay compensation, including medical compensation, during the lifetime of the injured employee. Id.
Further, N.C. Gen. Stat. § 97-25 requires that "[m]edical compensation shall be provided by the employer. In case of a controversy arising between the employer and employee relative to the continuance of medical, surgical, hospital, or other treatment, the Industrial Commission may order such further treatments as may in the discretion of the Commission be necessary."
5. The North Carolina Supreme Court in Derebery v. Pitt County FireMarshall, 318 N.C. 192, 347 S.E.2d 814 (1986), held that the prior statutory language in N.C. Gen. Stat. § 97-25 requiring an employer to furnish "other treatment or care" may include the duty to furnish alternate, wheelchair accessible housing. In Derebery plaintiff's existing housing was not suitable for plaintiff's needs as a permanently totally disabled person, and the owner of the house would not agree to any renovations. The Court held that these circumstances "exemplify the type of unusual case which justifies the Commission's conclusion of law that `Defendant shall furnish plaintiff . . . an appropriate place . . . to live in view of his condition.'"
6. The Court of Appeals has held that the expense of housing is an ordinary expense of life to be paid from the statutory substitute for wages provided under the Workers' Compensation Act. Timmons v. N.C.Dep't of Transp., 123 N.C. 456, 461-62, 473 S.E.2d 356, 359 (1996),aff'd per curiam, 346 N.C. 173, 484 S.E.2d 551 (1997). The Court stated although defendants do not have to pay the entire cost of constructing a residence for an injured worker, *Page 23 
 [T]he cost of modifying such housing, however, to accommodate one with extraordinary needs occasioned by a workplace injury, such as the plaintiff in this case, is not an ordinary expense of life for which the statutory substitute wage is intended as compensation. Such extraordinary and unusual expenses are, in our view, properly embraced in the `other treatment' language of G.S. § 97-25, while the basic cost of acquisition or construction of the housing is not.
Id. at 462, 473 S.E.2d at 359.
7. In this case, because plaintiff owns no dwelling that can be renovated to provide handicapped accessible housing, defendants are responsible for providing handicapped accessible housing for plaintiff. While the case law has held that the provision of ordinary housing is an expense of daily life to be paid from an injured worker's disability compensation, the additional cost of renting handicapped accessible housing is not an ordinary expense and should be borne by defendants, who have up to this point continuously provided accommodated housing for plaintiff at Shepherd Center and Briarcliff Haven since plaintiff's compensable injury by accident. Therefore, defendants shall pay the rental cost of reasonable handicapped accessible housing for plaintiff, which at this time is an apartment which can accommodate the necessary 24-hour daily attendant care for plaintiff. N.C. Gen. Stat. § 97-25; Derebery v. Pitt County FireMarshall, 318 N.C. 192, 347 S.E.2d 814 (1986).
8. Defendants are not required to purchase or lease adaptive transportation for plaintiff or for his use. McDonald v. BrunswickElec. Membership Corp., 77 N.C. App. 753, 336 S.E.2d 407 (1985). Defendants have provided reasonable transportation for plaintiff through a private transportation service, access to public transportation, and a motorized wheelchair and shall continue to do so. N.C. Gen. Stat. § 97-2(19). Should plaintiff purchase his own vehicle, *Page 24 
defendants are obligated to modify the same to accommodate plaintiff's disability. McDonald v. Brunswick Elec. Membership Corp.,supra, at 753, 336 S.E.2d at 407.
9. The report and life care plan prepared by Michael Fryar in this case was not an unbiased, objective, fair, and balanced assessment and is not accepted by the Full Commission as such. The Industrial Commission has the right and responsibility to determine the weight to be given the testimony of witnesses who appear before it. The Commission may accept or reject any or all of the witness' testimony.Fowler v. B.E. K. Construction, Inc.,92 N.C. App. 237, 373 S.E.2d 878 (1988). The duty and authority to resolve conflicts in the testimony extends to expert witnesses as well.Cauble v. Macke Co., 78 N.C. App. 793, 338 S.E.2d 320 (1986). Defendants are not required to pay for Mr. Fryar's report, because the same does not constitute a valid "rehabilitative service" within the meaning of N.C. Gen. Stat. § 97-2(19).
10. Plaintiff is entitled to have defendants pay for the preparation of a life care plan by a well-qualified and certified life care planner with long-standing experience dealing with catastrophic life care planning. Plaintiff is also entitled to an assessment by the life care planner of his current housing arrangements and whether the apartment is appropriate to accommodate plaintiff's physical needs. N.C. Gen. Stat. § 97-2(19); Timmons v. N.C. Dept. ofTransportation (Timmons IV), 351 N.C. 177, 522 S.E.2d 62 (1999);Scarboro v. Emery Worldwide Freight Corp.,192 N.C. App. 488, S.E.2d (2008).
11. The evaluation performed by Dr. Scelza provided expert medical testimony that may be helpful in the preparation of the new life care plan for plaintiff and the expenses of this evaluation shall be paid by defendants. N.C. Gen. Stat. § 97-2(19).
12. Defendants did not defend this claim in an unreasonable manner or without reasonable grounds and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1; *Page 25 Sparks v. Mountain Breeze Restaurant,55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for plaintiff's medical treatment and permanent total disability compensation at the rate of $496.77 for the remainder of plaintiff's lifetime as provided by N.C. Gen. Stat. § 97-31(17).
2. Defendants shall provide to plaintiff attendant care services 24 hours per day, seven days per week, as is currently being provided.
3. Defendants shall provide handicapped accessible housing for plaintiff, which at this time is a handicapped accessible apartment that can accommodate the necessary 24-hour daily attendant care for plaintiff. Defendants shall pay for the lease of such apartment, but the selection of an apartment must be reasonable under the circumstances.
4. Defendants shall provide transportation to plaintiff for all authorized medical appointments, including physical therapy. Defendants shall provide transportation for plaintiff's personal needs, limited to 50 miles from plaintiff's residence. Said transportation shall be provided upon reasonable 24-hour notice from plaintiff to defendants.
5. The parties are HEREBY ORDERED to confer and agree upon the selection of a well-qualified, certified life care planner with long-standing experience dealing with catastrophic injuries and life care planning. Defendants shall pay for the preparation of said life care plan and for an assessment of plaintiff's current living arrangements by the chosen life care planner. The *Page 26 
life care plan shall evaluate plaintiff's claim for further benefits as enumerated in paragraph 7 of the pre-trial agreement.
6. Defendants shall pay fees to any expert witnesses who testified in this case who have requested payment of a fee, and subject to approval of the same by the Industrial Commission.
7. Defendants shall pay the costs due the Commission.
This 3rd day of September, 2010.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
DISSENTING:
 S/___________________ LINDA CHEATHAM COMMISSIONER *Page 27